JARED H. BECK (CA Bar No. 233743)
ELIZABETH LEE BECK (CA Bar No. 233742)
VICTOR ARCA (FL Bar No. 123713)
jared@beckandlee.com
elizabeth@beckandlee.com
victor@beckandlee.com
BECK & LEE TRIAL LAWYERS
Corporate Park at Kendall
12485 SW 137th Ave., Suite 205
Miami, Florida 33186
Tel:    305-234-2060
Fax:    786-664-3334

Counsel for Plaintiff and Putative Classes

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ERNST VALERY, on Behalf of Himself, and All Others Similarly Situated,<br><br>        Plaintiff,<br><br>v.<br><br>WELLS FARGO & COMPANY; and WELLS FARGO BANK, N.A.,<br><br>        Defendants. | Case No:<br><br>Pleading Type: Class Action<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

**Introduction and Factual Allegations**

1.    In June 2020, *The New York Times* reported on a disturbing nationwide trend: "Black customers risk being racially profiled on everyday visits to bank branches."  Emily Flitter, *'Banking While Black': How Cashing a Check Can Be a Minefield*, **N.Y. Times** (June 18, 2020), available at http://archive.is/E4jLP and attached as **Exhibit 1**.  According to the report,

> For many black Americans, going to the bank can be a fraught experience. Something as simple as trying to cash a check or open a bank account can lead to suspicious employees summoning the police, causing anxiety and fear — and sometimes even physical danger — for the accused customers.

The article describes four recent examples of "banking while black," three of which occurred at Wells Fargo bank branches: (1) in December 2018, Claire Middleton tried to cash a $200 check at a Wells Fargo branch in Atlanta, where bank employees promptly accused her of fraud and summoned police; (2) in March 2019, Jabari Bennett attempted to withdraw $6,400 from his Wells Fargo account containing approximately $70,000 so he could buy a used car, but the Wilmington, Delaware branch refused to accept he was the account holder and threatened to call the police when he persisted in trying to complete the transaction; and (3) in April 2019, the manager of a Tampa, Florida-area Wells Fargo branch uttered the "N-word" to attorney Benndrick Watson while he was trying to open a business account for his law firm.

2.    Sadly, but perhaps not surprisingly, the instant action concerns yet another despicable and outrageous instance of "banking while black" at Wells Fargo.

3.    Plaintiff, Ernst Valery ("Plaintiff" or "Mr. Valery") is black.  In 1985, he immigrated to the United States from Haiti at the age of eight.  He rose from humble economic origins to obtain degrees in urban planning, public administration, and real estate development from Cornell University and Columbia University.  Today, Mr. Valery is a prominent real estate developer, with a focus on low-income and underserved minority communities, who has built residential and commercial real estate projects across the country, including in Maryland, Washington, D.C., Pennsylvania, Virginia, California, and New York.   The *Baltimore Business Journal* recently profiled Mr. Valery's impressive career.  *See* Morgan Eichensehr, *Podcast: Developer Ernst Valery on investing in neighborhoods, people with his projects*, **Balt. Bus. J.**

1

(May 23, 2019), _available at_ https://www.bizjournals.com/baltimore/news/2019/05/23/podcast-developer-ernst-valery-on-investing-in.html and attached as **Exhibit 2**. And as of December 10, 2020, Mr. Valery has been serving as the Co-Chair of the Housing & Neighborhood Development Committee for the new Mayor of Baltimore's transition team.

4.      On October 9, 2020, Mr. Valery and his wife visited the Wells Fargo branch at 5701 Reisterstown Road, Baltimore, Maryland, which is the branch closest to their home. On that day, Mr. Valery was carrying a check from the State of Maryland made out to Mr. and Mrs. Valery in the amount of three million dollars, which they wished to deposit in their joint account. The check is reproduced below and also attached as **Exhibit 3**.



It was a payment in connection with a historic tax credit that had been awarded by the State of Maryland for a development project Mr. Valery recently spearheaded to transform an abandoned Baltimore church into a brewery and affordable housing. _See_ Dan Rodgers, _In Baltimore, turning an abandoned church into the 'Ministry of Brewing,'_ **Balt. Sun** (June 4, 2019), _available at_ https://www.baltimoresun.com/opinion/columnists/dan-rodricks/bs-md-rodricks-0605-story.html and attached as **Exhibit 4**. When Mr. Valery presented Exhibit 3 for deposit, he was a customer of over 20 years standing with Wells Fargo, with multiple accounts under his name. Yet, instead of simply depositing the check and thanking Mr. Valery for his continued patronage of Wells Fargo, the bank manager emerged and proceeded to barrage him, in front of his wife, with a battery of interrogatives questioning his entitlement to the funds and his knowledge of what the funds

were for, and then the manager affirmatively suggested he was not the type of person who should be allowed to possess proceeds in such an amount.   Even after Mr. Valery calmly and professionally attempted to explain the source of the check and the nature of the tax credit involved (none of which he was required to divulge to the banker but which he did in order to placate the situation and facilitate the transaction), the Wells Fargo manager continued to refuse Mr. Valery's request to deposit the funds in the joint account.  Mr. Valery left unable to deposit the check.

5.      There are only two factors which caused Mr. Valery to leave Wells Fargo that day unable to deposit his own funds in his own bank account – funds which he had earned through years of extensive work as the chief developer on a restoration project that the State of Maryland has already deemed significant enough to merit more historic tax credits than any other project in the state during 2019.  Those two factors are (1) the color of Mr. Valery's skin; and (2) the racism of Wells Fargo.  Had Mr. Valery been a white property developer visiting ANY Wells Fargo to deposit a check – much less the branch in his own backyard –  we would simply not be here today.

6.      Mr. Valery's experience is just one more in a striking series of shameful "banking while black" incidents that have occurred at Wells Fargo branches in recent years, which constitute overwhelming evidence of systematic racism emanating from this banking institution.[1]  It is a shameful remnant of an era in American history when black people were considered property rather than individuals with the right to own property.  The time has long since come to put an end to this, once and for all.

## Jurisdiction and Venue

7.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 because the plaintiff's cause of action arises under federal law.   Alternatively, this Court has original

---

[1]       "Banking while black" is not Wells Fargo's first rodeo when it comes to institutionalized racism.   In 2012, it agreed to pay $175 million to resolve claims brought by the Department of Justice that it charged blacks and Hispanics higher rates and fees on mortgages.  *See* Rick Rothacker & David Ingram, *Wells Fargo to pay $175 million in race discrimination probe*, **Reuters** (July 12, 2012), attached hereto as **Exhibit 5**.  And on August 26, 2020, the Ninth Circuit greenlighted the City of Oakland's claims that Well Fargo's discriminatory lending practices caused diminished property tax revenues to the city.  *City of Oakland v. Wells Fargo & Co.*, 972 F.3d 1112 (9th Cir. 2020).

jurisdiction under 28 U.S.C. § 1332(d)(2) (the Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, and there is diversity of citizenship between the proposed class members and defendants. Alternatively, this Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1) because the individual matter in controversy between the plaintiff and defendants exceeds the sum or value of $75,000, exclusive of interests and costs, and the plaintiff is a citizen of a state different from both defendants' states of citizenship.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because both defendants reside here, and a substantial part of the events and omissions giving rise to the claim occurred here.

**Parties**

9.      Plaintiff Ernst Valery is a citizen of Maryland and an individual *sui juris*.

10.     Defendant, Wells Fargo & Company is a Delaware corporation with its principal place of business in San Francisco, California.

11.     Defendant, Wells Fargo Bank, N.A. is a national banking association and the banking subsidiary of Wells Fargo & Company, with its principal place of business in Sioux Falls, South Dakota.

12.     Collectively, the two defendants are referred through this Complaint as "Wells Fargo" or "Defendants."

**Class Action Allegations**

13.     Plaintiff seeks to certify an Injunctive Relief Class of all black individual bank customers of Wells Fargo.

14.     Plaintiff seeks to certify a Damages Class of all black individual bank customers or prospective bank customers of Wells Fargo who have had their right to make and enforce a contract with Wells Fargo impaired at any time within the four years preceding the filing of this action.

15.     This action is properly maintainable as a class action under Rule 23.

16.     Both Classes are so numerous that joinder of all members is impracticable.

17.     There are questions of law and fact which are common to the Classes and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following: Whether Wells Fargo's practices and policies toward black banking customers violates their equal rights under the law as set forth under 28 U.S.C. § 1981.

18.     Plaintiff's claims are typical of the claims of the other members of the Classes and Plaintiff does not have any interests adverse to the Classes.

19.     Plaintiff is an adequate representative of both Classes, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Classes.

20.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes which would establish incompatible standards of conduct for the party opposing the Classes.

21.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

22.     Defendants have acted on grounds generally applicable to the Classes with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

### Cause of Action

### Against Both Defendants for Violation of 42 U.S.C. § 1981

23.     Plaintiff repeats and incorporates by reference the allegations in Paragraphs 1 through 22 set forth above as if fully set forth herein.

24.     Plaintiff is black.

25.     Defendants had the intent to discriminate on the basis of race against Plaintiff.

26.     Defendants' discrimination concerned and impaired Plaintiff's right to make and enforce his banking contract with Wells Fargo.

27.    Defendants' conduct was done with malice and reckless indifference to the rights of Plaintiff and other members of the proposed Classes.

## **Prayer for Relief**

WHEREFORE, Plaintiff prays for judgment and relief against Defendants as follows:

A.    that the Court certify the Classes under Rule 23 of the Federal Rules of Civil Procedure and appoint Plaintiff as Class Representative and his attorneys as Class Counsel to represent the members of the Classes;

B.    that the Court declare that Defendants' conduct violates 42 U.S.C. § 1981;

C.    that the Court preliminarily and permanently enjoin Defendants from conducting their banking business in violation of 42 U.S.C. § 1981;

D.    that the Court order Defendant to implement whatever measures are necessary to remedy the violation of law described in this Complaint;

E.    that the Court order Defendant to notify each and every black banking customer of Wells Fargo an opportunity to obtain damages or restitution from Defendants;

F.    that the Court order Defendants to pay damages, including compensatory damages and punitive damages, to Plaintiff and members of the Damages Class;

G.    that the Court award injunctive relief and restitution to Plaintiff and members of the Injunctive Relief Class;

H.    that the Court award Plaintiff and the Classes their costs and attorneys' fees pursuant to statute, the common fund doctrine, and/or any other appropriate legal theory; and

I.    that the Court grant such other and further relief as may be just and proper.

## **Demand for Jury Trial**

Plaintiff hereby demands trial by jury in this action on all issues so triable.

DATED:  December 14, 2020

RESPECTFULLY SUBMITTED,

 /s/ Jared H. Beck
Jared H. Beck
Counsel for Plaintiff and Putative Classes

6

# Exhibit 1

archive.today
webpage capture

Saved from    https://www.nytimes.com/2020/06/18/business/banks-black-customers-racism.html    search

18 Jun 2020 16:16:41 UTC

All snapshots  from host  www.nytimes.com    no other snapshots from this url

Webpage | Screenshot    share  download .zip  report bug or abuse  donate



BUSINESS

*The New York Times*

SUBSCRIBE NOW    LOG IN

**Race and Policing** ›    | LIVE   Latest Updates    Use of Tear Gas    Atlanta Officer Charged    Calls for Racial Justice    Police Reform

# *'Banking While Black': How Cashing a Check Can Be a Minefield*

Black customers risk being racially profiled on everyday visits to bank branches. Under federal laws, there is little recourse as long as the banks ultimately complete their transactions.



Clarice Middleton was wrongfully accused of fraud by bank employees while trying to cash a check at a Wells Fargo in Atlanta.  Matthew Odom for The New York Times

 By **Emily Flitter**

June 18, 2020, 5:00 a.m. ET

  

Clarice Middleton shook with fear as she stood on the sidewalk outside a Wells Fargo branch in Atlanta one December morning in 2018. Moments earlier, she had tried to cash a $200 check, only to be accused of fraud by three branch employees, who then called 911.

Ms. Middleton, who is black, remembers thinking: "I don't want to die."

For many black Americans, going to the bank can be a fraught experience. Something as simple as trying to cash a check or open a bank account can lead to suspicious employees summoning the police, causing anxiety and fear — and sometimes even physical danger — for the accused customers.

There is no data on how frequently the police are called on customers who are making legitimate everyday transactions. The phenomenon has its own social media hashtag: #BankingWhileBlack.

Most people who experience an episode of racial profiling don't report it, lawyers say. Some find it easier to engage in private settlement negotiations. The few who sue — as Ms. Middleton did — are unlikely to win in court because of loopholes in the law. Now, the police killing of George Floyd in Minneapolis, which set off nationwide protests against systemic racism, is prompting more people to speak up.

Ms. Middleton had gone to the Wells Fargo branch in Druid Hills, a wealthy, mostly white neighborhood in Atlanta, to cash a refund for a security deposit from a real estate company that had an account with the bank. Three bank employees examined the check and her identification, but refused to look at the additional proof Ms. Middleton offered. They declared the check fraudulent, and one employee called the police, according to her lawsuit.

When an officer arrived, Ms. Middleton showed him her identification and the check stub. As a former bank teller, she knew that would be proof enough that her check was authentic. The officer left without taking action. The Wells Fargo employees asked Ms. Middleton whether she still wanted to cash the check.

---

**Thanks for reading The Times.**
**Subscribe to The Times**

---

"I said yes, because they had written all over the back of the check," said Ms. Middleton, who sued Wells Fargo last year for racial discrimination and defamation and sought an unspecified amount of damages.

Mary Eshet, a Wells Fargo spokeswoman, said Ms. Middleton had begun yelling "abusive and profane language" at the employees when she saw her ID being scanned.

"Employees tried to address Ms. Middleton's concerns by explaining our policies, but Ms. Middleton continued to yell profane language," Ms Eshet said. "She was asked to leave the branch multiple times and refused, so our employees followed their processes to engage law enforcement." She added that the bank "appreciates the sensitivities of engaging law enforcement and the importance of continually reviewing our training, policies and procedures."

Ms. Middleton's lawyer, Yechezkel Rodal, said her client had not used profanity. "Wells Fargo is in possession of the video surveillance showing exactly what happened in the branch that morning," he said. "The video will not support Wells Fargo's lies."

The Wells Fargo location in Westchase, Fla. Zack Wittman for The New York Times

Some incidents play out without the involvement of police or courts.

In March 2019, Jabari Bennett wanted to withdraw $6,400 in cash to buy a used Toyota Camry from a dealership in Wilmington, Del. He had just sold his house in Atlanta and moved to Wilmington to live with his mother. Having been a Wells Fargo customer for four years — he had around $70,000 in his account from the sale of his

house — Mr. Bennett walked into a nearby branch expecting to be back at the dealership and in his Camry within minutes.

He came away empty-handed and reeling.

First, a teller refused to accept that he was the account holder, questioning his out-of-state driver's license, he said — even though Mr. Bennett had informed the bank of his new address just two weeks earlier. Then, a branch manager told Mr. Bennett to leave. He left in disbelief, then returned to try to complete the transaction. This time, the manager threatened to call the police. Mr. Bennett left again.

The experience "made me feel like I was nothing," Mr. Bennett said.

He abandoned the deal on the car. A week later, he moved all his money out of Wells Fargo and then hired Mr. Rodal, who had gained a reputation for representing black customers against the bank after the story of one of his clients went viral in 2018. Mr. Rodal sent Wells Fargo a letter, but negotiations stalled.

Mr. Bennett decided to share his story publicly in light of the recent protests: "I don't want anybody else to go through what I went through."

Ms. Eshet, the Wells Fargo spokeswoman, said that branch employees were trained to spot potential fraud, and that the bank had increased security protocols to thwart internet scams involving large transfers of money.

"In this instance, there were enough markers for our team to conduct extra diligence in order to protect the customer and the bank," she said.

The protests also pushed Benndrick Watson into action.

Last spring, Mr. Watson was driven out of a Wells Fargo branch in Westchase, a wealthy neighborhood near Tampa, Fla., by what the branch manager described as a "slip of the tongue."

Mr. Watson, who was already a bank customer with a personal checking account, went to the branch to open a business account for his law firm.

"I felt like I had a knife in my gut," Benndrick Watson said
of his experience with a bank branch manager. "It's a
sickening word." Zack Wittman for The New York Times

A banker did a corporate records search and found Mr. Watson's
other business, a record label. Mr. Watson tried to direct the
employee to the records for his law firm instead.

Eventually, the branch manager got involved. He sat down across
from Mr. Watson and watched him enter information, including his
Social Security number, into a keypad.

Then, the man uttered the N-word.

"He just said it — clear as day, no mistake," Mr. Watson said. "My
jaw just dropped, I dropped the pen, there was silence, he kind of
looked at me, I said: 'Did you really just say that?'"

Mr. Watson said the man had immediately begun to protest, saying
that he had not meant to use the word, and that he was deeply
sorry. Mr. Watson did not buy it. He got up and left. The manager
followed him to his car, apologizing profusely, and resigned from
the bank shortly afterward.

"I felt like I had a knife in my gut," Mr. Watson said. "It's a
sickening word."

Mr. Watson turned to Mr. Rodal, who wrote to Wells Fargo seeking
an apology. The bank's regional president, Steve Schultz,
responded. "It seems that the utterance of the offensive term was
unintentional," Mr. Schultz wrote, but said the bank had taken
"corrective action" against the branch manager anyway, without

providing details. Ms. Eshet of Wells Fargo said the manager was deemed ineligible for any job with the bank.

Mr. Watson sued Wells Fargo in federal court in Florida on June 4.

In a statement, Ms. Eshet said: "We deeply apologize to Mr. Watson. There's no excuse for it, and while we took action to address the matter, it cannot undo what happened and how he felt. We are very sorry."

The problem is hardly confined to Wells Fargo. Last June, Robyn Murphy, a public relations consultant in Maryland, took her 18-year-old son, Jason, to a Bank of America branch in Owings Mills, Md., to open a joint savings account. Ms. Murphy, a 20-year customer of the bank, said she was shocked when an employee refused to proceed after a computer program flagged her son's Social Security number as fraudulent.

Ms. Murphy protested: Her son had his own checking account at the bank. His Social Security number had already been used there without issue. The Murphys are black. Mr. Murphy, his mother said, is 6-foot-9.

"For all I know, it's fraud," the employee told them. Ms. Murphy said he had asked them to come back with Mr. Murphy's Social Security card. When Mr. Murphy stood up, the employee yelled: "Don't get up!"

After Ms. Murphy contacted a senior vice president she knew at the bank, other officials apologized and offered to open the branch whenever it was convenient for the Murphys to return and complete the transaction — which they did.

"It weighed on us very heavily for a long time," Ms. Murphy said.

"We understand the client did not feel she and her son were treated properly in this interaction with our team, and we regret that," Bill Halldin, a Bank of America spokesman, said in an emailed statement. "These alerts are designed to protect our clients from fraud and misuse of their personal information." He declined to comment on what, if any, action the bank had taken against the employee.

Banks say they reject racism of any sort. The country's four largest banks by asset size, JPMorgan Chase, Wells Fargo, Bank of America and Citigroup, all require branch employees to complete annual diversity training, according to the banks' representatives.

Still, banks have not managed to weed out discrimination. The New York Times reported in December that a JPMorgan Chase employee had described a customer as being "from Section 8" and

therefore undeserving of service. The bank has since said it would seek to increase its sensitivity to issues surrounding race.

But little is mandated by law. The Civil Rights Act of 1964 lists specific businesses that may not treat black customers differently: movie theaters, hotels, restaurants, and performance and sports venues. Federal courts have held that because the law identifies the kinds of businesses to which it applies, those not on the list, such as banks, cannot be held to it. That loophole makes it hard for victims of racial profiling to win in court.

There is an additional limitation. In 1866, Congress created new laws to establish rights for black Americans, including one giving them the right to enter into agreements to buy goods or services and have those contracts enforced. Courts have since ruled that the law requires only that service be granted eventually.

In 2012, for instance, a federal appeals court ruled that a Hispanic man who had been turned away by a white cashier at a Target store in Florida did not have a case against Target because he was able to complete his purchases with a different cashier.

That could stymie Ms. Middleton's case. Wells Fargo is arguing that because she was eventually able to cash her check, a judge should dismiss it.

**Troubles at Banks**

**This Is What Racism Sounds Like in the Banking Industry**  Dec. 11, 2019

**Wells Fargo Says Its Culture Has Changed. Some Employees Disagree.**  March 9, 2019

**Wells Fargo Closed Their Accounts, but the Fees Continued to Mount**  Aug. 16, 2019

Emily Flitter covers banking and Wall Street. Before joining The Times in 2017, she spent eight years at Reuters, writing about politics, financial crimes and the environment. @FlitterOnFraud



More in Business                                                Most Popular

Bryan Anselm for The New York Times

**She Spent 16 Years as Morgan Stanley's Diversity Chief. Now She's Suing.**

June 16

Brendan Mcdermid/Reuters

**After Aunt Jemima, Reviews Underway for Uncle Ben, Mrs. Butterworth and Cream of Wheat**

3h ago

Tony Cenicola/The New York Times

**Aunt Jemima Brand to Change Name and Image Over 'Racial Stereotype'**

June 17

Lauren Victoria Burke/Associated Press

**Former Bumble Bee C.E.O. Is Sentenced in Tuna Price-Fixing Scheme**

June 16

James Resnick

**One Monthly Fee, a Catalog of Porsches**

6h ago

---

**Editors' Picks**

Victor Llorente for The New York Times

**Jimmy Fallon Is Sorry. But What Does That Mean?**

June 11

Netflix

**Dave Chappelle's Netflix Special: Three Key References to Know**

June 13

Doug Mills/The New York Times

**A New Book Brings Melania Trump Into (Slightly) Better Focus**

June 14

Trump Can't Immediately End DACA, Supreme Court Rules

Irene Neuwirth Makes a Flower Necklace Out of Paper

Bolton Says Trump Impeachment Inquiry Missed Other Troubling Episodes

Five Takeaways From John Bolton's Memoir

Eleanor Carol Leavell Barr, Wife of Kentucky Congressman, Dies at 39

Does Trump Want to Fight for a Second Term? His Self-Sabotage Worries Aides

In 'The Room Where It Happened,' John Bolton Dumps His Notes and Smites His Enemies

Opinion: Notes From One Year on Testosterone

'That '70s Show' Actor Danny Masterson Charged With Raping 3 Women

Opinion: Is Trump Trying to Spread Covid-19?

**The New York Times**

Go to Home Page »

**NEWS**

**OPINION**

**ARTS**

**LIVING**

**LISTINGS & MORE**

© 2020 The New York Times Company

NYTCo     Contact Us     Work with us     Advertise     T Brand Studio     Your Ad Choices     Privacy     Terms of Service     Terms of Sale     Site Map     Help     Subscriptions
Do Not Sell My Personal Information     California Notices

# Exhibit 2

Please Sign In and use this article's on page print button to print this article.

Commercial Real Estate

# Podcast: Developer Ernst Valery on investing in neighborhoods, people with his projects



Ernst Valery is the managing partner of SAA | EVI Development.

ERIC STOCKLIN



By Morgan Eichensehr – Reporter, Baltimore Business Journal
May 23, 2019, 3:08pm EDT

**IN THIS ARTICLE**

**Commercial Real Estate**
Industry

**Ernst Valery**
Person

**Otis Rolley**
Person



The Pivot w/ Baltimore Business Journal

The Pivot: Ernst Valery, managing partner…

SOUNDCLOUD

Share

28:46

Cookie policy

Ernst Valery thought he wanted to be architect, then an urban planner, then maybe work in the public sector. But ultimately, he settled on development. It seemed like the perfect way to combine all of his interests and and create real impact in urban areas.

The word "impact" is thrown around a lot these days, Valery said, but he doesn't like to use it lightly. In his work he said he tries to focus not just on making something that is beautiful, but also something sustainable, supportive of the surrounding community and considerate of people's wants and needs. In that vein, he looks to work and invest in urban communities that other developers and investors might overlook.

"Things are called 'risky' because there are certain people that our society doesn't want to invest in," Valery said. "And until we say that all people are worth it, we're always going to have this dichotomy and uneven investment."

Valery started his development work in Philadelphia. He was drawn to Baltimore after meeting Otis Rolley, the city's former director of planning, and hearing how passionately he spoke about the character of its people and its different neighborhoods. Upon visiting Baltimore, Valery said he immediately understood what Rolley was talking about — so he moved, and began trying to make his impact here.

Since coming to the city, Valery has been involved with several transformative redevelopment projects that have helped reshape the visual and structural makeup of certain Baltimore neighborhoods. For example, he recently completed the $22 million Nelson Kohl apartment project in Station North. That eight-story building was erected in place of old rowhomes, and brought 103 new apartments to the neighborhood right behind Penn Station.



The Nelson Kohl opened last year.
COURTESY OF NELSON KOHL

Valery has also been involved with the city-led effort to revitalize the blighted areas of the Park Heights neighborhood near Pimlico Race Course. Currently, he is working to redevelop 130-year-old St. Michael's Roman Catholic Church near Patterson Park, into a brew pub and new apartments.

In this episode of The Pivot, I talked with Valrery about all of those projects and what impact he hopes each will bring to their respective neighborhoods. Plus we discussed which neighborhoods he might be working in next.

Thanks for checking out the podcast. Keep an eye out for new episodes of The Pivot, released each month on Soundcloud.

## MORE FOR YOU

More ›



**Mayor-elect Brandon Scott's transition team packed with business, community leaders**



**Historic East Baltimore church to soon be converted into artist apartments, coworking space, cafe**



**'I am unafraid to do the right thing': Brandon Scott sworn in as mayor of Baltimore**



**The 15 industries in Greater Baltimore that secured the most PPP money**



**The capital of sprawl getting a radically car-free neighborhood**



**Should 2020 alter your retirement plans? Not necessarily, these CFPs say.**

### Latest People on the Move

More ›







| Will Jawish | Mark Cox, C... | Kirsten M. Er... | Stephen J. C... | Jorge Otalora |
| Gordian Energy... | RSM US LLP | Miles & Stockbr... | Miles & Stockbr... | Harkins Builders |

Back to Top ▲

# BALTIMORE **BUSINESS JOURNAL**

**Home**   **News**   **Lists & Leads**   **People**   **Companies**   **Events**   **Jobs**   **Store**

**SUBSCRIBERS**

Start a Subscription

Subscriber-Only Content

Digital Edition

Book of Lists

Book of Lists - Unlimited

Manage your Account

**ABOUT & CONTACT**

About Us

About The Business Journals

Advertise

Help & FAQs

Contact Us

Circulation Sales Center Directory

**APPS & SYNDICATION**

Mobile Apps

Syndication/RSS

**FOLLOW US**

**NEWSLETTERS**

Sign Up Now

**ACBJ**

American City Business Journals

AmericanInno

Bizwomen

Hemmings

Inside Lacrosse

Sports Business Journal

User Agreement   |   Privacy Policy   |   Your California Privacy Rights   |   Ad Choices

© 2020 American City Business Journals. All rights reserved. Use of and/or registration on any portion of this site constitutes acceptance of our User Agreement (updated 1/1/20) and Privacy Policy and Cookie Statement (updated 1/1/20). The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of American City Business Journals.

# Exhibit 3

FACE OF THIS CHECK HAS A COLORED BACKGROUND ON WHITE PAPER

**State of Maryland**
COMPTROLLER OF MARYLAND
ANNAPOLIS, MARYLAND

7-11
520

**REFUND IMPREST FUND**

PAY:    THREE MILLION AND 00/100 DOLLARS

*0027368954*    10/06/2020    $3,000,000.00
DATE    DOLLARS    CENTS

CHECK VOID 1 YEAR AFTER DATE

TRANSACTION I.D.
952089901562

TO THE ORDER OF:

PERSONAL
REFUND 2019

ERNST VALERY
DANA L VALERY

**M&T Bank**
Manufacturers and Traders Trust Company

BALTIMORE MD    21209-4501

Peter Franchot
Nancy K. Kopp

# Exhibit 4

ADVERTISEMENT

DAN RODRICKS    COLUMNISTS    OPINION

# In Baltimore, turning an abandoned church into the 'Ministry of Brewing'

**By DAN RODRICKS**
THE BALTIMORE SUN    |    JUN 04, 2019

  



Ernst Valery, of SAA/EVI Development, wears a "Ministry of Brewing" T-shirt as he checks on work in the East Baltimore church being converted into a brew pub. (Baltimore Sun)

And so, later this year, there will be a brewery where priests once celebrated Mass, where thousands of couples were wed, where thousands of babies were baptized. In fact, large stainless steel tanks have already been installed in the sanctuary of old St. Michael the Archangel Church, at Wolfe and Lombard, in Upper Fells Point.

"Old" is an insufficient description for the amazing stone edifice on that high corner of Washington Hill. I should say "former" church because it has been closed for eight years and, at some point before the Redemptorists sold it off, St. Michael's was "rendered to profane use," in accordance with canon law.

ADVERTISING



ADVERTISEMENT

So no one can officially claim sacrilege when they see what the new owners, trading as the Ministry of Brewing, have in mind for the place. Nor will it be the first house of God turned into a house of beer.


The ornate entrance to St. Michael the Archangel Church on East Lombard Street. (Baltimore Sun)

Before I go on, allow me to describe the mixed feelings that suddenly appeared in my old altar boy brain as I stood in the center aisle of what was once one of the largest Catholic churches in the country's oldest diocese.

I guess we should be long past sadness about the Roman Catholic Church, but even for those who tried to make a comeback and failed, angered by the nature and extent of clergy sexual abuse, there's still ambivalence. This was your church once, and the church of immigrant ancestors until their dying days. Going to Mass to receive the Eucharist was a tradition we grew up with and carried into adulthood.

[Most read] Maryland could receive coronavirus vaccine by next week; hospital workers, nursing home residents to get shots first »

It's hard to let go of that, despite all — despite all that overshadows the church's charitable works around the world: the abuse scandal that has cost at least $3 billion in damages and millions of followers, the Vatican's foolish unwillingness to break from the all-male, supposedly celibate priesthood.

ADVERTISING

5G you can afford, for the moments you can't afford to miss.

As church attendance fell over the last half-century, the hierarchy had to consolidate or close parishes.

It was not merely the loss of faith and trust that led to this.

In Baltimore, there was the loss of some 300,000 residents over a half-century of social change. Among those who fled the long-standing city parishes were increasingly affluent, mainly white families. They moved to suburbs, and the archdiocese built churches for them there, eliminating the need to return to the old neighborhoods on Sundays.

This — and Bernie Madoff — hurt St. Michael's, particularly. (I'll come back to Madoff in a moment.)



The conversion of old St. Michael's church into a brewery has been underway for months. (Baltimore Sun)

St. Michael's opened in 1852, when its parishioners were mostly German immigrants. Its pastors and curates once served one of the largest flocks in the premier American see. St. Michael's had 10,000 parishioners in 1900. Its campus included a rectory and large parish hall, a girls school, a boys school and a convent. Over the years, the ethnicity of those who received the sacraments at St. Michael's changed, reflecting the population of East Baltimore through the 20th Century — Poles, Italians, Czechs, Koreans, Lumbee American Indians and African-Americans. By the early part of this century, St. Michael's had become a beloved parish of Hispanic immigrants. Despite a **passionate effort to keep the historic church open**, it went dark in 2011.

Now, about Bernie Madoff.

A decade ago, when federal prosecutors revealed Madoff's massive fraud scheme, they listed the Redemptorists, the order of priests who had run St. Michael's for 160 years, among his victims.

Starting in 1992, the **Baltimore province had entrusted part of its endowment to Madoff**. According to the National Catholic Reporter, proceeds from the Madoff investment were used to meet many needs, including scholarships for Baltimore children to attend Catholic schools. The Reporter said the Redemptorists had suffered "significant" losses as a result of Madoff's Ponzi scheme. Though the Baltimore province denied it at the time, it was hard to believe the losses did not contribute to St. Michael's demise.

The city has a lot of empty buildings, but because of its location and mass, taking up half a block, St. Michael's was especially regrettable, a reminder of what once was and could probably never be again.

[Most read] Mike Preston: Stage is set for Ravens QB Lamar Jackson to prove he's a long-term answer | COMMENTARY »

And then, one day, Ernst Valery, a developer with expertise in historic tax credits, and his partners — David Wendell, Jeff Hunt and Michael Powell — bought the church and remaining buildings from the Redemptorists. Starting last summer, construction crews have turned the parish hall, rectory and girls school into apartments, keeping many of the original features — including some of the classroom chalkboards — in place.

ADVERTISEMENT

And the grand space of St. Michael's, with its barrel-vault ceiling, will become one of Baltimore's largest brew pubs, with tables made from timbers taken from parts of the church, a long bar and kitchen. Valery thinks Baltimore, with its rich history of brewing, should push for more such places, creating jobs in a growing industry. He intends to have his brewmaster train young people in crafting beer.

While it might seem a little strange to see big steel tanks where the altar used to be, this project will bring a dead Baltimore corner back to life. Customers will be able to go where no one has gone for years. They won't be able to get communion, but they will be able to commune. The church will become a public space again, and that is something to celebrate, not mourn.

**LATEST DAN RODRICKS**

Baltimoreans: This is not your grandmother's City Council | COMMENTARY
1h

Paul Sarbanes: The Senate needs more like him today | COMMENTARY
DEC 7, 2020

For Brandon Scott, Baltimore's next mayor, a little advice and some big ideas | COMMENTARY
DEC 4, 2020

FEEDBACK

If the old ghosts of St. Michael's flit about — the German immigrants who landed here ages ago — some might frown, some might cry. But I think most will be happy to know they can get a beer there.

SECTIONS

**ONLY $1 FOR 4 MONTHS**
SALE ENDS 1/4

LOG IN



The parish hall, girls school and rectory at old St. Michael's are being converted into apartments while the church becomes a brewery. (Baltimore Sun)

Topics: Bernard Madoff



### Dan Rodricks
The Baltimore Sun

  

Dan Rodricks is a long-time columnist for The Baltimore Sun, and a local radio and television personality who has won several national and regional journalism awards over a reporting, writing and broadcast career spanning five decades. He is the author of three books, including "Father's Day Creek" (Apprentice House 2019).

## Prime Members Are Using This Hack to Avoid Amazon's Price Hike

CAPITAL ONE SHOPPING | SPONSORED

## Challenge Your Brain With This Must-Play Strategy Game. No Install.

FORGE OF EMPIRES | SPONSORED

## These Cars Are So Loaded It's Hard to Believe They're So Cheap

LUXURY SUVS | SEARCH ADS | SPONSORED

America's 24 Most Charming Small Towns

Maps That Show Us A New Perspective

EXPLORER PLANS | SPONSORED

 BALTIMORE SUN

What was 'so God-awful' about Trump? | READER COMMENTARY

 BALTIMORE SUN



19-year-old charged with first-degree murder in robbery of man, Baltimore Police say

By PHILLIP JACKSON

NY DAILY NEWS

## Models don eye-popping looks in tape-only swimsuit show

## Here Are The 33 Coolest Gifts of 2020

ZANGDEAL | SPONSORED

## Florida Launches New Policy For Cars Used Less Than 50 Miles/Day

SMART LIFESTYLE TRENDS | SPONSORED

BALTIMORE SUN

José Iglesias and Hanser Alberto moves show Orioles' 'ultimate goal' isn't close as rebuild continues

BALTIMORE SUN

Fugitive who died in gun battle with Maryland police killed his estranged girlfriend in Florida, authorities say

By JOAN WEESE

CHICAGO TRIBUNE

## An apology to Donald Trump, from the 'fake news' media

BALTIMORE SUN

NBA draft insider Jeremy Woo on Jalen Smith, Anthony Cowan and Maryland men's basketball

BALTIMORE SUN

Baltimore man charged with fatally stabbing a man in his bathtub, police say

By PHILLIP JACKSON

## Old Man's Neighbor Blocked His Driveway With Cinder Blocks So He Taught Him A Huge Lesson

POST FUN | SPONSORED

## Top 10 U.S States People Are Leaving

FORBES | SPONSORED

CHICAGO TRIBUNE

## If Stephen Hawking is right about Earth's end, keep an eye on the deer

## At 33, This Is What Ray Rice Is Left With

FINANCECHATTER | SPONSORED

## This Battleship Evaded Detection By Pretending To Be An Island

MATERNITY WEEK | SPONSORED

Florida Launches New Guidelines For Cars Used Less Than 50 Miles/Day

Here Are The 33 Coolest Holiday Gifts of 2020

IMAGE REALISTON TRENDS | SPONSORED

 BALTIMORE SUN

Two arrested, charged with murder in fatal Columbia shooting

 BALTIMORE SUN

Maryland governor uses news conference to clamp down on COVID-19, but earlier actions belie his tough talk | COMMENTARY

By DANIEL ZAWODNY

## After This Nevada Lake Dried Up, Geologists Found Eerie Carvings

NEXT REFINANCE | SPONSORED

## If Your Dog Licks His Paws - Top Vet Says To Do This Daily

ULTIMATE PET NUTRITION NUTRA THRIVE SUPPLEMENT | SPONSORED

## These Cars Are So Loaded It's Hard to Believe They Cost Under Average Prices

LUXURY CARS | SEARCH ADS | SPONSORED

CHICAGO TRIBUNE

## One of the stranger houses you'll find is now on Airbnb. Take a look.

## No Disinfecting Wipes At The Store? Bulk Order Them Here

BROOKLYN TEXTILES | SPONSORED

## This Only Looks Like A Regular Pocketknife - A Deejo Is Anything But That

MY DEEJO | SPONSORED

CHICAGO TRIBUNE

## Trump's coronavirus response has been brilliant. Here's what you don't understand.

### You May Like

Sponsored Links by Taboola

**Remember Tiger Wood's Ex-wife? Try Not To Smile When You See Her Now**
SportPirate

**Her Dress Went Down In ACM History**
Livingly

**Michael Oher Tells A Whole Different Story About 'The Blind Side'**
Gameday News

**25 Worst Movies Ever, According To Rotten Tomatoes**
Post Fun

**MOST READ • MARYLAND** ›

**CARROLL COUNTY CRIME**

Westminster man facing felony rape charge

14m

---

**CORONAVIRUS**

Maryland could receive coronavirus vaccine by next week; hospital workers, nursing home residents to get shots first

16m

---

**OBITUARIES**

John N. Smallwood Jr., award-winning Philadelphia sports columnist who attended Arundel High and U. of Maryland, dies

37m

ADVERTISEMENT

**CONNECT**

    

**TRIBUNE PUBLISHING**

Chicago Tribune                                    New York Daily News

Orlando Sentinel                                   Sun Sentinel of Fla.

The Morning Call of Pa.                            Hartford Courant

Daily Press of Va.                                 The Virginian-Pilot

The Daily Meal                                     BestReviews

**COMPANY INFO**

Careers                                            About our ads

Classifieds                                        Contact us

Privacy Policy                                     Terms of Service

TAG disclosure                                     Manage Web Notifications

FAQ                                                Advertise with us

About us

Copyright © 2020, Baltimore Sun

# Exhibit 5

Discover Thomson Reuters   •••

Directory of sites   Login   Contact   Support

**REUTERS**

World   Business   Markets   Breakingviews   Video   More

BUSINESS NEWS    JULY 12, 2012 / 2:35 PM / UPDATED 8 YEARS AGO

# Wells Fargo to pay $175 million in race discrimination probe

By Rick Rothacker, David Ingram

7 MIN READ

CHARLOTTE, N.C./WASHINGTON (Reuters) - Wells Fargo & Co WFC.N has agreed to pay $175 million (113.4 million pounds) to resolve allegations it discriminated against qualified African-American and Hispanic borrowers in its mortgage lending, the U.S. Justice Department said on Thursday.

A Wells Fargo bank is seen in Del Mar, California January 17, 2012. REUTERS/Mike Blake

In the second-largest settlement of its kind, the biggest U.S. mortgage lender will pay $125 million to borrowers who were allegedly steered into higher-priced subprime loans or who paid higher fees and rates than white borrowers.

Wells Fargo will also contribute $50 million to homebuyer assistance programs in eight metropolitan areas around the country. The government identified those areas needing the most help in recovering from the housing crisis.

The settlement, which needs approval from a judge, would end the investigation into whether the fourth-largest U.S. bank between 2004 and 2009 knowingly targeted minorities for risky mortgages that came with higher costs, according to documents filed in the U.S. District Court for the District of Columbia.

"This a case about real people, African-American and Latino, who suffered real harm as a result of Wells Fargo's discriminatory lending practices," Thomas Perez, U.S. assistant attorney general for civil rights, said at a news conference in Washington.

"People with similar qualifications should be treated similarly. They should be judged by the content of their credit worthiness and not the colour of their skin."

The government investigation found that loans submitted to Wells Fargo by mortgage brokers had varied interest rates, fees, and costs based only on race and not correlated to the borrowers' creditworthiness, according to the court document.

The Obama administration has mounted a campaign to closely monitor banks in order to ensure loan discrimination practices that were a part of the housing bust and led to record defaults are eliminated. Bank of America Corp's BAC.N Countrywide Financial unit agreed in December to pay a record $335 million to settle similar charges.

ADVERTISEMENT

Wells Fargo said it was settling the matter "solely for the purpose of avoiding contested litigation" with the U.S. Justice Department. In the consent order with the government, Wells asserted it treated all its customers fairly and without regard to race and national origin.

"We believe it is in the best interest of our team members, customers, communities and investors to avoid a long and costly legal fight, and to instead devote our resources to continuing to contribute to the country's housing recovery," Mike Heid, president of Wells Fargo Home Mortgage, said in a statement.

## WELLS TO END LOANS THROUGH BROKERS

The bank signalled in a securities filing in May that it could face civil charges from the U.S. Justice Department. The bank said the settlement also resolves pending litigation filed in 2009 by the State of Illinois on behalf of borrowers, and resolves an investigative complaint filed in 2010 by the Pennsylvania Human Relations Commission.

Wells Fargo, which makes more than one-third of U.S. mortgage loans, declined to say whether it has already set aside reserves for the settlement. The bank reports second-quarter earnings on Friday.

The government alleged that Wells Fargo discriminated by steering about 4,000 African-American and Hispanic borrowers into subprime mortgages when white borrowers with similar credit profiles received prime loans. Officials also alleged that Wells charged about 30,000 African-American and Hispanic borrowers higher rates and fees than white borrowers because of their race or national origin rather than their credit worthiness.

The loans were largely made through independent mortgage brokers, rather than directly by Wells Fargo loan officers. Starting Friday, the bank said it has voluntarily decided to stop making loans through brokers.

ADVERTISEMENT



PAID FOR AND POSTED BY CME GROUP

## 2020 Comes to a Close

Traders will be watching whether new COVID-19 vaccines stay on their stated schedules.

Read More ›

These mortgages accounted for about 5 percent of its home loan volume. Rivals such as Bank of America have already made similar moves.

"These loans are being originated under our name," Wells spokesman Oscar Suris said. "If we can't control the customer experience, we are going to get out of it."

The bank will continue to buy loans that are originated and funded by smaller banks and mortgage companies, a practice known as correspondent lending, Suris said.

Wells on Thursday also resolved a lawsuit filed by the city of Baltimore in 2008 alleging the bank engaged in "reverse redlining," or intentionally targeting minority communities for predatory mortgage loans, leading to high foreclosures in minority neighbourhoods.

Wells will spend $4.5 million of the $50 million earmarked for eight metro areas in Baltimore. It will also pay an additional $3 million for local housing and foreclosure initiatives and set a five-year lending goal for the city. In return, Baltimore will drop its suit.

Wells reached a similar agreement in May with the city of Memphis, which had also filed a reverse redlining lawsuit.

'DISCRIMINATION WITH A SMILE'

ADVERTISEMENT



The Wells Fargo case was initially referred to the Justice Department in 2009 by the Office of the Comptroller of the Currency, overseeing the nation's largest banks, and was taken to the U.S. Justice Department's civil rights division.

The victims of the discrimination will be compensated, according to the Justice Department. Wells Fargo will be required to conduct new monitoring programs to ensure fair lending standards are in place in the future.

Perez, the U.S. assistant attorney general, gave examples of how the alleged discrimination played out. In one instance, an African-American customer in the Chicago area in 2007 seeking a $300,000 loan paid on average $2,937 more in fees than a similarly qualified white applicant. In another example, a Latino borrower in the

Miami area in 2007 seeking a $300,000 loan paid on average $2,538 more in fees than a similarly qualified white applicant.

"All too frequently, Wells Fargo's African-American and Latino borrowers had no idea whatsoever that they could have gotten a better deal, no idea that white borrowers with similar credit would pay less," he said. "That is discrimination with a smile."

In the next step in the case, Wells has agreed to conduct a review of loans it made directly to customers and will compensate African-American and Hispanic borrowers who were placed into subprime loans when similarly qualified borrowers received prime loans. Perez said he expected 3,000 to 4,000 more victims will be found in this review.

Wells Fargo shares were down .69 percent at $33.04 in afternoon trading.

Reporting by David Ingram, Margaret Chadbourn, Rick Rothacker; editing by Jeffrey Benkoe, Andrew Hay and Bernard Orr

*Our Standards: The Thomson Reuters Trust Principles.*

**MORE FROM REUTERS**